**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **CASE NO. 5:20-CR-50050-001**

**REMBERTO RIVERA** **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Defendant Remberto Rivera is named in a two-count Indictment charging him with possession with intent to distribute methamphetamine (Count One) and being a felon in possession of a firearm (Count Two). Defendant filed a Motion to Suppress Evidence (Doc. 19) seeking to exclude evidence from the two searches that support these charges. The Government responded (Doc. 20), and the Court held a hearing on the Motion on April 21, 2021. For the reasons set forth below and stated from the bench on April 21, the Court **DENIES** Defendant's Motion (Doc. 19). To the extent this Memorandum Opinion and Order differs from the Court's order from the bench, the written Memorandum Opinion and Order controls.

## I. BACKGROUND

In 2014, Defendant pleaded guilty to simultaneous possession of drugs and firearms, and as a result he was sentenced in state court to 216 months' imprisonment in the Arkansas Department of Corrections. On September 23, 2019, the Arkansas Parole Board granted him parole, but before he was released he had to sign a form that waived certain rights. That form includes the following language:

> As a condition of my supervised parole or probation, I agree to allow any Arkansas Community Correction[s] officer, or any certified law enforcement officer, to conduct a warrantless search of my person, place of residence,

> or motor vehicle at any time, day or night, whenever requested by the Arkansas Community Correction[s] officer, or certified law enforcement officer.
>
> I understand that the warrantless search based on this waiver must be conducted in a reasonable manner but does not need to be based on a clearly expressed suspicion that I am committing or I have committed a criminal offense.

(Doc. 19-1). Defendant also executed a document titled "Conditions of Release" in order to be released on parole. The Conditions of Release form states in relevant part:

> You must submit your person and/or property, place of residence, and motor vehicles to search and seizure at any time, day or night, with or without a search warrant by any Arkansas Department of Community Correction officer. You must also submit your person, place of residence, or motor vehicle to search at any time, day or night, whenever requested by any other certified law enforcement officer.

Government's Exhibit 2. At the April 21 hearing, Karen Mitchell, a release officer employed by the Arkansas Department of Community Corrections, credibly testified that she reviews the search waiver with soon-to-be parolees. She testified that she did so with Defendant and that he did not express any reservations about signing the waiver. Additionally, the Conditions of Release document was signed by both Defendant and Ms. Mitchell.

### A. The March 3, 2020 Search and Seizure

The following facts form the basis of Count One of the Indictment and were proven by a preponderance of the evidence at the April 21, 2021 hearing.

In February 2020, Detective Sanchez learned from a reliable confidential source that Defendant had been selling methamphetamine in Springdale, Arkansas. Detective Sanchez also learned that Defendant had signed a search waiver as a condition of his parole. On March 3, 2020, Detective Sanchez, Detective Thompson, and Detective Kaleta were conducting surveillance at the Heritage Inn Hotel in Springdale, Arkansas,

which they understood as a location where drug activity occurs. During this surveillance, Detective Sanchez observed a black vehicle park in front of Room 106 of the hotel. Dispatch confirmed to Detective Sanchez that the Mazda was registered to Evelin and William Rivera.

Detective Sanchez then saw a Hispanic male, who was the only occupant of the vehicle, exit the driver door, open the rear passenger door, and grab a black backpack.[1] Detective Sanchez positively identified the male as Defendant. Detective Sanchez then exited his car, yelled, "Hey Alex," and Defendant turned to Detective Sanchez as if in recognition. Detective Sanchez explained that "Alexander" is Defendant's middle name and that he is commonly known as "Alex." Detective Sanchez then approached Defendant and identified himself as a police officer, while Detectives Thompson and Kaleta moved closer to surround Defendant.

Detective Sanchez told Defendant that he knew his identity and that he had reliable information that Defendant was selling methamphetamine. Detective Sanchez asked Defendant what was in the backpack, and Defendant replied that the backpack was not his. Defendant then provided his Arkansas driver's license, confirming his identity. During this encounter, Detective Sanchez smelled the odor of marijuana coming from Defendant. Based upon the smell of marijuana and the search waiver, Detective Sanchez searched the backpack and found 122.2 grams of methamphetamine, 15.9 grams of marijuana, a digital scale, a measuring scoop, a glass pipe, and $3,440 in currency.

---

[1] A security camera at the Heritage Inn Hotel captured this encounter, though the recording lacks audio. That recording is Government's Exhibit 3.

**B. The May 16, 2020 Search and Seizure**

The following facts form the basis of Count Two of the Indictment and were proven by a preponderance of the evidence at the April 21, 2021 hearing. In early 2020, Fayetteville police received various complaints about suspicious activity at 470 North Durango Place. Specifically, local residents complained that multiple vehicles would come and go from the residence at all hours of the day and night.

On May 16, 2020, Officers Kuchenbecker and Vermillion were separately patrolling the area near 470 North Durango Place to look for the suspected drug activity. The officers noticed a black Nissan Altima leave 470 North Durango Place, and they followed it north on Double Springs Road. Officer Kuchenbecker briefly lost visual contact with the vehicle, so he turned east down Persimmon Road and observed that the vehicle had turned onto North Monroe Station Drive and had parked against the flow of traffic. Officer Kuchenbecker then parked his car in the driveway of a home on Persimmon Road where he could observe the parked vehicle. At this time, Officer Kuchenbecker believed the occupants of the vehicle had entered a house.

A few minutes later, Officer Kuchenbecker observed two individuals, Defendant and Crystal Starr, walk west on Persimmon, turn north on North Monroe Station Road, and then approach the vehicle. Officer Kuchenbecker testified that they were looking around as if to detect whether they were being followed. Officer Kuchenbecker then approached them in his marked patrol car and, when they saw him, they crossed North Monroe Station Road and walked away from the vehicle. Based upon these actions, Officer Kuchenbecker decided to exit his car and speak to them.

Officer Kuchenbecker exited his patrol car and asked them what they were doing, and Defendant replied that they were just taking a walk.[2] Officer Vermillion arrived a short time later. Officer Kuchenbecker requested identification from them: Defendant produced his driver's license, while Starr (who did not have any identification) identified herself orally. Starr explained that they were visiting her friend, who allegedly lived at a nearby house but was not home. Defendant elaborated that, rather than wait in the car in the heat, they decided to talk a walk around the neighborhood. Officer Kuchenbecker then asked Defendant if the black Nissan Altima belonged to him, and Defendant responded affirmatively. Starr stated that they had come from Wedington Drive, which Officer Kuchenbecker knew to be untrue. Officer Kuchenbecker then asked for and received permission to search the persons of Defendant and Starr. The officers conducted the searches, but they did not find any illegal or suspicious items.

Approximately eight minutes after Officer Kuchenbecker initially stopped Defendant and Starr, dispatch informed the officers that both of them had valid search waivers on file. Defendant and Starr confirmed that they were on parole. Officer Kuchenbecker told Defendant that he was going to search the vehicle based upon the search waiver. The officers then observed that Defendant was exhibiting signs of fleeing, so they attempted to handcuff him and take his car keys. At that time, Defendant attempted to flee. During a struggle with the officers, he yelled, "No, kill me! I'm not going to jail!" The officers eventually handcuffed him and placed him in a patrol car. Officer Kuchenbecker searched the black Nissan Altima and found a 9mm handgun under the

---

[2] Officer Kuchenbecker's bodycam recorded the interaction between Officer Kuchenbecker, Officer Vermillion, Defendant, and Starr. This recording is Government's Exhibit 4.

driver's seat. He also found a Glock Model 21, .45 caliber with several rounds of ammunition.

In his present Motion, Defendant contends that the Court should exclude the evidence gathered from these two searches. He argues that the mere existence of the signed search waiver does not justify his seizure and subsequent searches; instead, he argues that reasonable suspicion must first exist. In support, he cites to the decisions in *Cherry v. State*, 791 S.W.2d 354 (Ark. 1990), and *Lane v. State*, 513 S.W.3d 230 (Ark. 2017), where the Arkansas Supreme Court held that parolee consents allow warrantless searches only if reasonable grounds exist for such searches. Defendant argues that neither Detective Sanchez nor Officer Kuchenbecker had reasonable suspicion to seize and search him and therefore the fruits of those encounters should be excluded from trial. The Government responds that the stops were valid under *Terry* and that the signed search waiver authorized the searches. Notably, the Government does not argue that the search waiver specifically authorizes law enforcement officers to stop—rather than search—Defendant without cause or suspicion. Accordingly, the Court assumes that the Government must show that the stops of Defendant were valid regardless of the search waiver's existence.

## II. LEGAL STANDARD

The United States Constitution imposes certain well-known limitations on searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. Under Fourth Amendment jurisprudence, there are three categories of encounters between citizens and police officers: "(1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144–45 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

As to the first category of stops—consensual encounters—law enforcement officers do not violate the Fourth Amendment when they merely "approach[] individuals on the street or in other public places and put[] questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citations omitted). A lawful consensual encounter may become a seizure, however, if "it loses its consensual nature." *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Once law enforcement has "seized" a person—*i.e.*, when "a reasonable person would have believed he was not free to leave"—then the encounter is transformed into an investigatory *Terry* stop. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

*Terry* stops are only lawful if the law enforcement officer has reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S.S 1, 30 (1968). To have reasonable suspicion, a police officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Whether law enforcement has reasonable suspicion to conduct a *Terry* stop is "based on 'the totality of the circumstances, in light of the officer's

experience.'" *United States v. Polite*, 910 F.3d 384, 387 (8th Cir. 2018) (quoting *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009)). Accordingly, "[o]bservations of the officers are considered 'as a whole, rather than as discrete and disconnected occurrences.'" *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008) (quoting *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987)). Indeed, "[a]n officer may have reasonable suspicion to conduct a *Terry* stop based on a combination of factors even where no single factor, considered alone, would justify a stop." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citing *Terry*, 392 U.S. at 22).

Furthermore, law enforcement officers may stop and search parolees based upon search waivers, and there are several Supreme Court cases analyzing whether such searches and seizures are valid under the Fourth Amendment. In *Griffin v. Wisconsin*, the Supreme Court held that "[s]upervision [of parolees] . . . is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. 868, 875 (1987). Because parole has the dual purpose of rehabilitating the offender and protecting society, it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision in the court of supervision. *Id.* at 875–76. The Court expanded *Griffin* by holding in *United States v. Knights*, 534 U.S. 112 (2001), that searches performed in compliance with a valid parole agreement search provision may be constitutional even if they were not "conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." *Id.* at 117. To determine whether such a search is reasonable under the Fourth Amendment, a court must balance "on one hand, the degree to which it intrudes upon an individual's privacy

and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 119 (internal quotation omitted).

But the *Knights* decision left open one issue: Could a condition of release so diminish a parolee's reasonable expectation of privacy that a suspicion-less search of a parolee by a law enforcement officer would not offend the Fourth Amendment? In *Samson v. California*, the Supreme Court answered that question in the affirmative. 547 U.S. 843, 857 (2006). In that case, the Supreme Court had to decide whether a Fourth Amendment violation occurred when a police officer conducted a suspicion-less search of a parolee on the street. *Id.* at 846. The search in question was authorized by a California statute providing that "every prison eligible for release on state parole 'shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.'" *Id.* (quoting Cal. Penal Code Ann. § 3067(a) (West 2000)). The Supreme Court found that the statute and the search it authorized did not violate the Fourth Amendment. Specifically, the Supreme Court held that the parolee's acceptance of a clear and unambiguous search waiver significantly diminished his reasonable expectation of privacy. *Id.* at 852. The Supreme Court found that the state had a substantial interest in reducing recidivism. *Id.* at 853. Weighing the state's interest against the parolee's diminished expectation of privacy, the Supreme Court determined that the suspicion-less search was valid under the Fourth Amendment.

When a defendant in a criminal case believes that evidence against him has been obtained from an unconstitutional search or seizure, he may move to exclude that evidence from trial as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371

U.S. 471, 484–88 (1963). Although ordinarily defendants bear the burden of proof on motions to suppress, there are a variety of exceptions to this rule—one of which applies when a motion to suppress challenges the existence of probable cause for a warrantless search or seizure. *See, e.g.*, *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006) (referring to the possibility that in the suppression hearing below, the government might have "failed in its burden to prove that Deputy Brown had probable cause to stop Mr. Andrews's car"); *see also Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search."); *cf. Recznik v. City of Lorain*, 393 U.S. 166, 169–70 (1968) (holding that a "motion to suppress should have been granted" because the prosecutor "did not meet the burden of showing probable cause").

Since the posture here is that Defendant is challenging two warrantless searches, the Government bears the burden of proving by a preponderance of the evidence that the challenged searches were justified. *Cf. United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("In any event, the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005) (requiring government to prove voluntary consent to a warrantless search by a preponderance of the evidence); *United States v. James*, 353 F.3d 606, 616–17 (8th Cir. 2003) (requiring government to prove by a preponderance of the evidence that unlawfully obtained information would inevitably have been discovered by lawful means).

## III. DISCUSSION

With those legal standards in mind, the Court will now apply them to the facts. Importantly, the Court observes that many of the facts cited above in the "Background" section are undisputed and, to the extent they are disputed, the Court finds that all of those facts have been established by a preponderance of the evidence, particularly the video records that were received into evidence at the April 21, 2021, hearing. The Court now turns to analyze the validity of each of the stops and searches challenged by Defendant.

### A. The March 3, 2020 Search and Seizure

Defendant argues that *Cherry* and *Lane* apply and that Detective Sanchez lacked the required reasonable suspicion to stop and search him in the Heritage Inn Hotel parking lot. The Government argues that Detective Sanchez did indeed have reasonable suspicion to stop Defendant and, even if he did not, Detective Sanchez knew that Defendant had signed a search waiver and that the waiver authorized suspicion-less searches pursuant to *Samson*. For the reasons explained below, the Court agrees with the Government.

First, the Court addresses the validity of Detective Sanchez's stop of Defendant. Detective Sanchez's interaction with Defendant was, at least initially, consensual, though it quickly became a *Terry* stop when Defendant was surrounded by officers. Detective Sanchez had reasonable suspicion to initiate and prolong the stop after he encountered Defendant. Detective Sanchez credibly testified that a reliable confidential informant previously told him that Defendant was selling methamphetamine in Springdale. Detective Sanchez was also aware of Defendant's criminal history, which includes

trafficking in controlled substances. Then, while staking out the Heritage Inn Hotel, a known location for drug activity, Detective Sanchez observed Defendant approaching a hotel room with a backpack. The straw that breaks the camel's back is that once Detective Sanchez was near Defendant, he smelled the odor of fresh marijuana emanating from Defendant. Taken together, these facts established reasonable suspicion—if not probable cause—to initiate and prolong the stop of Defendant.

Next, the Court turns to the validity of Detective Sanchez's search of Defendant's backpack. The validity of this search hinges upon the enforceability of the search waiver signed by Defendant. As a condition of release, all Arkansas parolees must agree to be subject to suspicion-less searches. This is codified into Arkansas law:

> A person who is placed on supervised probation or is released on parole . . . is required to agree to a waiver as a condition of his or her supervised probation or parole that allows any certified law enforcement officer . . . to conduct a warrantless search of his or her person, place of residence, or motor vehicle at any time, day or night, whenever requested by the certified law enforcement officer . . . .
>
> A warrantless search that is based on a waiver required by this section shall be conducted in a reasonable manner but does not need to be based on any articulable suspicion that the person is committing or has committed a criminal offense.

Ark. Code Ann. §§ 16-93-106(a)(1)–(2). This statute is substantively identical to the California statute analyzed in *Samson*. As in *Samson*, the ADC—via Ms. Mitchell—unambiguously communicated the suspicion-less search condition to Defendant by presenting the search waiver and Order of Conditional Release to him and having him sign them. These facts are on all fours with *Samson*, so the Court is bound by precedent to conclude that Defendant "did not have an expectation of privacy that society would recognize as legitimate." *Samson*, 547 U.S. at 852. Further, like California in *Samson*,

Arkansas has a legitimate interest in preventing parolee recidivism. Thus, the search waiver here does indeed permit suspicion-less searches of Defendant and his possessions.

Defendant's citations to *Cherry* and *Lane* do not convince the Court otherwise. It is true that the *Cherry* court held that "the consent allows a warrantless search only if reasonable grounds exist." 791 S.W.3d at 357. Still, that decision was issued in 1990 and predates *Samson* and the enactment of Arkansas Code § 16-93-106. The *Lane* decision—which relied on *Cherry* for the proposition that parole officers must have reasonable grounds to search parolees—was issued after *Samson* and the enactment of Arkansas Code § 16-93-106, but it does not acknowledge *Samson* or the state statute.

Recently, in *Clingmon v. State*, an Arkansas Court of Appeals panel acknowledged this incongruity and concluded that *Samson*, not *Cherry* and *Lane*, governs the analysis of search waivers issued pursuant to Arkansas Code § 16-93-106. 2021 WL 904841, at *7 (Ark. Ct. App. Mar. 10, 2021). The facts in *Clingmon* were strikingly similar to the ones here: Based upon a search waiver, officers searched parolee Clingmon's home and found marijuana and methamphetamine. Clingmon argued that *Cherry* and *Lane* required the officers to have reasonable grounds to justify the search, but the panel disagreed, citing *Samson*. Furthermore, the *Clingmon* court helpfully clarified that searches under Arkansas Code § 16-93-106 do not require any reasonable suspicion. *Id.* at *10.

Applying these principles, it is clear to the Court that Detective Sanchez's search and seizure of Defendant on March 3, 2020 did not violate the Fourth Amendment. Detective Sanchez was aware that Defendant had a valid search waiver on file, and he positively identified Defendant before approaching him. During Detective Sanchez's

encounter with Defendant, he quickly identified himself as a law enforcement officer. In short, Detective Sanchez properly stopped Defendant, and Defendant promptly learned that he was a law enforcement officer; at that point, the search waiver required Defendant to submit his body and possessions to a suspicion-less search.

For all of these reasons, the Court finds that the March 3, 2020 search and seizure of Defendant and his backpack did not violate the Fourth Amendment.

**B. The May 16, 2020 Search and Seizure**

The Court finds that the following facts—all of which the Government established by a preponderance of the evidence—demonstrate that the May 16, 2020 search and seizure were lawful under the Fourth Amendment.

Here, the essential question is whether Officer Kuchenbecker's initial stop of Defendant was justified up to the point when Officer Kuchenbecker learned that Defendant had a search waiver on file.[3] The Court finds that the stop was justified by reasonable suspicion. It is undisputed that Defendant and Starr had just visited 470 North Durango, a known location for drug-related activity. Officer Kuchenbecker credibly testified that Defendant and Starr travelled from 470 North Durango, parked on North Monroe Station Drive, exited their vehicle, and walked around the block in a manner suggesting that they were trying to evade police detection. Then, as they neared the black Nissan Altima, Officer Kuchenbecker approached them; at this point, they saw Officer Kuchenbecker in his patrol car moving toward them, and they immediately crossed the road *away* from the black Nissan Altima. Officer Kuchenbecker reasonably

[3] The Government conceded at the April 21, 2021 hearing that law enforcement must know about the existence of the search waiver for it to authorize a suspicion-less search. The Court will assume without deciding that this is true.

interpreted this behavior as suggesting that Defendant and Starr were involved in a narcotics crime and did not want to be associated with the black Nissan Altima, and the Court finds that this reasonable suspicion justified the initial stop.

The Court also finds that Officer Kuchenbecker did not unnecessarily prolong the *Terry* stop. The Eighth Circuit has held that officers may prolong *Terry* stops to check a suspect's criminal history and to determine if there are any outstanding warrants. *See United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (citing *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998); *United States v. White*, 81 F.3d 775, 778 (8th Cir. 1996)); *see also United States v. Clayborn*, 339 F.3d 700, 702 (8th Cir. 2003) (holding that an officer does not unlawfully extend a traffic stop by requesting a driver's license and running a records check). Officer Kuchenbecker approached Defendant and Starr and immediately asked them if they had identification. Starr identified herself orally, while Defendant presented his driver's license. Officer Kuchenbecker provided their information to dispatch, and it took approximately eight minutes for dispatch to report its findings to Officer Kuchenbecker. At this point, Officer Kuchenbecker learned that Defendant was on parole with a search waiver on file. These eight minutes were a reasonable extension of the *Terry* stop to confirm Defendant's identification and conduct a records check. Ultimately, once Officer Kuchenbecker learned of Defendant's search waiver, he was authorized to conduct a suspicion-less search of Defendant.

Furthermore, Defendant's and Starr's statements during the *Terry* stop created additional reasonable suspicion that they had committed or were committing a crime. First, Defendant immediately admitted to Officer Kuchenbecker that the black Nissan Altima was his vehicle, which confirmed that Defendant and Starr were the individuals

who drove away from 470 North Durango. Second, in response to a question from Officer Kuchenbecker, Starr told him that they had just come from Wedington Drive, which Kuchenbecker knew to be untrue. Moreover, when asked to explain why they were walking around the neighborhood, Defendant implausibly explained that they were waiting for their friend to come home and that it was too hot to wait in the car. This explanation made little sense. These actions increased Officer Kuchenbecker's reasonable suspicions, rather than dispelling them.

To summarize, Officer Kuchenbecker conducted a lawful stop of Defendant based upon reasonable suspicions, and he was justified in prolonging the stop to check Defendant's criminal history and because of Defendant's (and Starr's) suspicious statements during the stop. Overall, the entire duration of the May 16, 2020 stop passes muster under the Fourth Amendment, and the search of Defendant vehicle was justified by the search waiver.[4]

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Remberto Rivera's Motion to Suppress Evidence (Doc. 19) is **DENIED**. This case will be set for trial in a separate scheduling order.

---

[4] Alternatively, since Defendant was arrested after he attempted to flee, there is a reasonable probability that the Nissan Altima would have been towed and officers would have found the guns in the inevitable inventory search of the vehicle. *See United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003) (noting that the inevitable discovery of a firearm in a vehicle inventory search excused the fact that the defendant's arrest was based upon statements obtained in violation of his *Miranda* rights).

**IT IS SO ORDERED** on this 6th day of May, 2021.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE